# In the United States Court of Appeal for the Ninth Circuit

**SANTA CLARITA VALLEY WATER AGENCY**,

*Plaintiff-Appellee/Cross-Appellant,*

v.

**WHITTAKER CORPORATION**.,

*Defendant-Appellant/Cross-Appellee,*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
NO. 2:18-CV-06825-SB-RAO
HON. STANLEY J. BLUMENTHAL, JR., DISTRICT JUDGE

## APPELLANT'S OPENING BRIEF

Shelby L. Dyl
PILLSBURY WINTHROP
 SHAW PITTMAN LLP
1200 Seventeenth St., N.W.
Washington, D.C. 20036
Tel.: 202-663-9010
shelby.dyl@pillsburylaw.com

Mark E. Elliott
PILLSBURY WINTHROP
 SHAW PITTMAN LLP
725 South Figueroa St., 36th Fl.
Los Angeles, CA 92037
Tel.: 310-351-7814
mark.elliott@pillsburylaw.com

*Counsel for Defendant-Appellant/Cross-Appellee Whittaker Corporation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellant Whittaker Corporation certifies that its direct parent corporation is Meggitt-USA, Inc., which is owned by Meggitt PLC. Parker Hannifin Corporation is the ultimate parent of these companies.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................. 1

STATEMENT OF JURISDICTION ................................................... 4

STATEMENT OF ISSUES ............................................................... 5

STATEMENT OF THE CASE ........................................................... 6

    A.  Background......................................................................... 6

        1.  SCVWA and its Wells ................................................ 6

        2.  Potential Sources of Contamination ............................... 8

        3.  Whittaker's Remediation of the Bermite Site............... 11

    B.  Prior Disputes ...................................................................... 14

    C.  The Current Dispute ............................................................. 15

        1.  The Claims, Counterclaims and Cross-claims............... 15

        2.  The SIC Settlement ........................................................ 16

        3.  SCVWA's Restoration Costs Theory ............................ 18

        4.  The Trial and the Judgment .......................................... 21

        5.  The Post-Judgment Motions .......................................... 25

SUMMARY OF ARGUMENT......................................................... 27

STANDARD OF REVIEW............................................................... 30

ARGUMENT.................................................................................... 30

I.    SCVWA SHOULD NOT HAVE BEEN PERMITTED TO
     SEEK RESTORATION COSTS AT TRIAL ............................. 30

    A.  The District Court Erred in Permitting SCVWA to
        Assert a Restoration Costs Theory at Trial that It Had
        Failed to Disclose in Discovery ........................................... 32

        1.  SCVWA Did Not Disclose Its Restoration Costs
            Theory Until After the Close of Discovery, in
            Violation of Its Obligations under Rule 26(a) .............. 33

        2.  SCVWA's Failure to Timely Disclose Its
            Restoration Costs Theory Was Unjustified .................. 38

      3.   SCVWA's Failure to Timely Disclose Its Restoration Costs Theory Prejudiced Whittaker ........... 40

   B.  Alternatively, the District Court Abused Its Discretion in Denying Whittaker's Motion in Limine to Preclude Evidence of Restoration Costs ............................................. 45

II.   SCVWA FAILED TO PRESENT EVIDENCE OF GENUINE RESTORATION COSTS ........................................ 47

   A.  Repairs and Remediation Efforts Qualify as Restoration Costs Only If Those Efforts Return Injured Property to Its Condition Prior to Injury .............................. 47

   B.  SCVWA Did Not Show that the Treatment Facilities It Seeks Would Restore Groundwater to Its Condition Absent Contamination from the Bermite Site ...................... 51

   C.  Because There is No Evidence the Proposed Treatment Facilities Would Restore Conditions Prior to Injury, the Cost of the Facilities Are Not Genuine Restoration Costs ...................................................................... 55

   D.  The District Court's Rulings Upholding the Jury's Restoration Costs Award Are Contrary to California Law, the Record, and the Nature of Restorations Costs ...... 61

III.  EVEN IF NOT VACATED, THE RESTORATION COSTS AWARD SHOULD BE REDUCED BECAUSE IT IS UNREASONABLE IN RELATION TO ANY ACTUAL DAMAGE ................................................................. 65

CONCLUSION .................................................................................. 73

STATEMENT OF RELATED CASES ............................................. 75

CERTIFICATE OF COMPLIANCE ................................................ 76

CERTIFICATE OF SERVICE .......................................................... 77

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*United States v. 14.3 Acres of Land*,
2011 WL 2414348 (S.D. Cal. June 10, 2011) ............................... 39

*Agence France Presse v. Morel*,
293 F.R.D. 682 (S.D.N.Y. 2013) .................................................. 44

*Athena Cosms., Inc. v. AMN Distribution Inc.*,
2022 WL 4596549 (C.D. Cal. Aug. 16, 2022) ........................ 35, 36

*Austrian Airlines Oesterreichische Lufverkehrs AG v. UT Fin. Corp.*,
2005 WL 977850 (S.D.N.Y. Apr. 28, 2005) ................................. 45

*Bass v. First Pac. Networks, Inc.*,
219 F.3d 1052 (9th Cir. 2000) .................................................. 1, 61

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ......................................................... 56

*Bluemlein v. Szepanski*,
300 N.W.2d 493 (Mich. Ct. App. 1980) ...................................... 58

*Brady v. Gebbie*,
859 F.2d 1543 (9th Cir. 1988) ................................................ 71, 72

*Brumer v. Gray*,
2019 WL 2552201 (D. Nev. June 20, 2019) ................................ 45

*Estate of de Laveaga*,
50 Cal. 2d 480 (1958) ................................................................... 60

*State v. Diamond Lakes Oil Co.*,
347 Ark. 618 (2002) ..................................................................... 50

*Estakhrian v. Obenstine*,
233 F. Supp. 3d 824 (C.D. Cal. 2017) .......................................... 36

iv

*Falco v. James Peter Assoc., Inc.*,
    365 A.2d 301 (Conn. 1973) ...................................................... 57, 59

*Falco v. James Peter Assoc., Inc.*,
    335 A.2d 301 (Conn. 1973) ........................................................... 59

*Freeport Sulphur Co. v. S/S Hermosa*,
    526 F.2d 300 (5th Cir. 1976) ........................................................ 50

*Geddes & Smith Inc. v. St. Paul Mercury Indem. Co.*,
    63 Cal. 2d 602 (1965) ........................................................ 49, 60, 61

*Green v. General Petroleum Corp.*,
    205 Cal. 328 (1928) ..................................................... 42, 49, 60, 61

*Grouse River Outfitters Ltd. v. Oracle Corp.*,
    848 Fed. App'x 238 (9th Cir. 2021) ............................................. 46

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
    2017 WL 3016385 (N.D. Ind. July 17, 2017) .............................. 39

*Haskell v. Harris*,
    669 F.3d 1049 (9th Cir. 2012) ...................................................... 56

*Heininger v. Dunn*,
    101 Cal. App. 3d 858 (1980) ................................................. *passim*

*Herzog v. Grosso*,
    41 Cal. 2d 219 (1953) ................................................................... 49

*Higgins v. Standard Lloyds*,
    149 S.W.2d 143 (Tex. Ct. App. 1941) ......................................... 58

*Hoffman v. Construction Protective Servs., Inc.*,
    541 F.3d 1175 (9th Cir. 2008) ...................................................... 30

*Kelly v. CB&I Constructors, Inc.*,
    179 Cal. App. 4th 442 (2009) ..................................... 41, 50, 61, 66

*King v. Wang*,
    2021 WL 5299917 (S.D.N.Y. Nov. 15, 2021) ........................ 37, 38

*Krause v. City of Mohave,*
    459 F. Supp. 3d 1258 (D. Az. 2020) ............................................. 44

*Linforth v. San Francisco Gas & Elec. Co.,*
    156 Cal. 58 (1909) ............................................................ 49, 60, 61

*In re Malden Mills Indus., Inc.,*
    303 B.R. 688 (1st Cir. Bankr. 2004) ............................................ 58

*Massachusetts Port Auth. v. Sciaba Constr.,*
    766 N.E.2d 118 (Mass. Ct. App. 2002) .................................... 40, 58

*Matrix Int'l Textile, Inc. v. Monopoly Textile, Inc.,*
    2017 WL 2929376 (C.D. Cal. May 12, 2017) .............................. 46

*Merchant Shippers Ass'n v. Kellog Express & Draying Co.,*
    28 Cal. 2d 594 (1946) ............................................................ 50, 62

*Metz v. Soares,*
    142 Cal. App. 4th 1250 (2006) ..................................................... 48

*Mozzetti v. City of Brisbane,*
    67 Cal. App. 3d 565 (1997) ....................................................*passim*

*Munro v. Univ. of S. Cal.,*
    2023 U.S. Dist. LEXIS 9707 (C.D. Cal. Jan. 19, 2023).... 36, 37, 43

*R.B. Matthews, Inc. v. Transamerica Transp. Services, Inc.,*
    945 F.2d 269 (9th Cir. 1991) ........................................................ 30

*Robson v. Zumstein Taxicab Co.,*
    248 S.W.2d. 872 (Ky. Ct. App. 1923) ........................................... 58

*Safeco Ins. Co. v. J& D Painting,*
    17 Cal. App. 4th 1199 (1993) ..................................... 41, 48, 49, 50

*Salazar v. Matejcak,*
    245 Cal. App. 3d 634 (2016) ..................................................*passim*

*Silvagni v. Wal-Mart Stores, Inc.,*
    2017 WL 5100162 (D. Nev. Nov. 2, 2017) .................................. 44

*Starrh and Starrh Cotton Growers v. Aera Energy LLC*,
   153 Cal. App. 4th 583 (2007)................................................*passim*

*Starrh and Starrh Cotton Growers v. Aera Energy LLC*,
   2012 WL 210452 (Cal. Ct. App. 2012)........................................ 56

*Town of Superior, Montana v. Asarco*,
   874 F. Supp. 2d 937 (D. Mont. 2004) ......................................... 59

*Tribble v. Raytheon Co.*,
   414 Fed. App'x 98 (9th Cir. 2011) ................................................. 1

*Union City Transfer Co v. Texas & N.O. Ry. Co.*,
   55 S.W.2d 637 (Tex. Ct. App. 1932) ........................................... 58

*State v. Urbanek*,
   177 N.W.2d 14 (Iowa 1970)......................................................... 57

*US Salt, Inc. v. Broken Arrow, Inc.*,
   2008 WL 2277602 (D. Minn. May 30, 2008) .............................. 39

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001)............................................... 33, 45

## Statutes and Codes

United States Code
   Title 28 Section 1331....................................................................... 4
   Title 28 Section 1367(a) .................................................................. 4
   Title 42 Section 6972(a) .................................................................. 4
   Title 42 Section 9613(b).................................................................. 4

California Water Code Section 145-2 .................................... 1, 7, 8, 15

Carpenter-Presley-Tanner Hazardous Substance Account Act, CAL.
   HEALTH & SAF. CODE § 253000 *et seq.* 5-ER-1102–11........ 1, 4, 15

## Rules and Regulations

Federal Rules of Appellate Procedure
   Rule 32(a)(7)(C) ........................................................................... 76
   Rule 32(f)...................................................................................... 76

Federal Rules of Civil Procedure

Rule 26 ........................................................................... 27
Rule 26(a)(1)(A)(iii) ................................................ 32, 34
Rule 26(a)(1)(C) ........................................................ 34
Rule 26(b)(3)(B) ......................................................... 36
Rule 26(e)(1) .............................................................. 34
Rule 26(e)(1)(A) ........................................................ 32
Rule 37(c)(1) .............................................................. 33

Ninth Circuit Rules of Appellate Procedure

Circuit Rule 28-2.6 .................................................... 75
Circuit Rule 32-1 ....................................................... 76

## Other Authorities

Dan B. Dobbs & Caprice L. Roberts, *Dobbs on Remedies*
Section 5.2 (3d ed. 2018) ............................................. 41

**INTRODUCTION**

These appeals arise from an award of $64.8 million in damages. The vast bulk of these damages—over $60 million—are "restoration costs" for the construction and operation of groundwater treatment facilities.[1]

No court in California or applying California law has ever awarded restoration costs based on such a theory.[2] Indeed, the California Court of Appeal rejected a similar theory where the plaintiff failed to show that the proposed treatment would restore the groundwater in question to its condition before injury. *See Starrh and Starrh Cotton Growers v. Aera Energy LLC*, 153 Cal. App. 4th 583 (2007) ("*Starrh I*"). The evidence of restoration costs in this case suffers from the same defect, and the size of the award is grossly disproportionate to any harm suffered.

---

[1] The District Court also awarded SCVWA $607,500 for its cost recovery claims under the Comprehensive Environmental Response Liability Act, 42 U.S.C. § 9607(a) and the California Hazardous Substance Account Act, Cal. Health & Safety Code §25300 et seq. Whittaker does not appeal this portion of the judgment.

[2] *See Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 n.2 (9th Cir. 2000) ("[A] federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state.").

The plaintiff in this case, Santa Clarita Valley Water Agency ("SCVWA"), is a public water agency that serves the Santa Clarita Valley, approximately 35 miles northwest of downtown Los Angeles. It sued defendant Whittaker Corporation ("Whittaker") for damages caused by groundwater contamination from a manufacturing site that Whittaker formerly owned and operated. SCVWA presented expert testimony concerning the cost of constructing and operating facilities to treat contaminated groundwater for drinking water distribution, but it failed to present any evidence that the facilities would restore the groundwater to its condition prior to any contamination from the site formerly owned by Whittaker. It is well-settled, however, that restoration costs must only return property to its condition before injury, and no more. Because SCVWA failed to satisfy this basic requirement, and in fact presented no evidence of the original condition of the property, it failed to show genuine restoration costs and the jury's award should be vacated.

The restoration costs award also should be vacated because it is unreasonable and excessive. Where restoration costs are appropriate and recoverable, they must be reasonable in relation to the harm caused. Here, most of the more than $60 million in restoration costs

awarded were for treatment of volatile organic compounds ("VOCs") at a handful of wells. By SCVWA's own admission, however, there are currently only trace amounts of VOCs in the groundwater at issue which do not affect its safe use as drinking water. Indeed, SCVWA has continually served water from two of the wells at issue to its customers since 2010. The more than $60 million in restoration costs awarded by the jury is disproportionate to the harm here.

It is not necessary, however, to reach the merits of the restoration costs award because the District Court erred in permitting SCVWA to assert such costs at trial. SCVWA originally sought to recover the cost of constructing groundwater treatment facilities on a different theory: that California state agencies required them. When Whittaker showed in a motion in limine that there was no evidence of such a requirement, SCVWA pivoted and sought to recover the costs under a restoration costs theory. By this point, however, discovery had closed, and Whittaker's ability to develop evidence concerning the specific requirements for restoration costs was severely prejudiced. Consequently, the District Court erred in allowing SCVWA to assert a previously undisclosed restoration costs theory for the first time after the close of discovery.

The judgment should be vacated, and this case remanded with instructions to amend the judgment to deny SCVWA any restoration costs. Alternatively, this case should be remanded to the District Court with instructions to reduce the restoration costs award by the more than $40 million awarded to treat VOC contamination.

## STATEMENT OF JURISDICTION

SCVWA sued Whittaker in the Central District of California, claiming nuisance, negligence and trespass as well as violations of the Comprehensive Environmental Response and Recovery Act ("CERCLA"), 42 U.S.C. §9601 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 *et seq*., and the Carpenter-Presley-Tanner Hazardous Substance Account Act ("HSAA"), CAL. HEALTH & SAF. CODE §253000 *et seq.* 5-ER-1102–27. The District Court had subject matter jurisdiction over the CERCLA and RCRA claims under 28 U.S.C. §1331, 42 U.S.C. §9613(b), and 42 U.S.C. §6972(a), and supplemental jurisdiction over the remaining state law claims under 28 U.S.C. §1367(a).

This Court has appellate jurisdiction. The District Court entered final judgment on June 28, 2022. 1-ER-33–35. Whittaker filed a timely notice of appeal from the judgment on July 28, 2022, 9-ER-

4

2040–2044, and SCVWA timely cross-appealed on August 10, 2018, 9-ER-2050–54. On November 9, 2022, SCVWA also timely appealed an October 14, 2022 order denying its motion for attorneys' fees. 9-ER-2045–49. Finally, the District Court granted in part and denied in part the parties' post-judgment motion on December 28, 2022, 1-ER-6–32, and filed an amended judgment on January 11, 2023. 1-ER-2–5. Whittaker timely filed amended notice of appeal from the amended judgment and post-judgment motion orders on January 18, 2023. 9-ER-2035–39.

## STATEMENT OF ISSUES

1. Whether the District Court either erred or abused its discretion in permitting SCVWA, which failed to identify restoration costs in its Rule 26(a) disclosures, to assert restoration costs for the first time after the close of discovery.

2. Whether the District Court erred in finding that SCVWA presented evidence of genuine restoration costs even though it failed to present any evidence that the groundwater treatment facilities for which it sought the costs would restore the groundwater in question to its condition prior to any injury from the contamination at issue here.

3.    Whether the more than $60 million in restoration costs awarded to SCVWA to construct and operate groundwater treatment facilities was unreasonable and excessive in light of SCVWA's admission that there are only trace levels of VOC contamination that do not render the groundwater in question unsafe for drinking.

## STATEMENT OF THE CASE

### A.    Background

#### 1.    SCVWA and its Wells

SCVWA is a public water agency which was formed in 2018 by consolidating a state agency that provided wholesale service (Castaic Lake Water Agency), a county water district that provided retail service (Newhall County Water District), and two private companies (Santa Clarita Water Company and Valencia Water Company). Cal. Wat. Code §145-2; *id*. §145-4 (b)-(d); 6-ER-1144–45. While SCVWA imports most of the water that it supplies, it obtains about a third of that water from wells, 9-ER-1973; 6-ER-1201–03, treats this water, and provides it to residential, industrial and other users. 2-ER-128.

Most of SCVWA's wells extract groundwater from the Alluvium, an aquifer that extends to as deep as 200 feet below the

Santa Clara River. 9-ER-1973, 1986. About 30% of the groundwater extracted by SCVWA, however, is from the Saugus Formation, which extends below the Alluvium to depths of at least 2,000 feet. *Id*.; *see also* 8-ER-1817.

The four wells at issue in this case draw groundwater from the Saugus Formation. They are located inside the city of Santa Clarita: the Saugus 1 (S-1) and Saugus 2 (S-2) wells are near the Saugus neighborhood, and the V-201 and V-205 wells are near the Valencia neighborhood. As the map below shows, the S-1 and S-2 wells are located between residential areas to the west and industrial areas such as the Whittaker-Bermite site to the north and east:



January 2020

TODD
GROUNDWATER

Figure 1
Site Location Map

8-ER-1752. The V-201 and V-205 wells are further west in more residential areas with a retail center to the north between them. *Id.*

## 2. Potential Sources of Contamination

According to a 2015 report for one of SCVWA's predecessors, the S-1, S-2, V-201, and V-205 wells are near several potential sources of contamination.



7-ER-1473.

*The Saugus Industrial Center*—The closest potential source is the Saugus Industrial Center ("SIC"), which is outlined in yellow in the map above. The SIC is on a site only 700 feet northeast of S-2 and 900 feet east of S-1. 7-ER-1438; 6-ER-1315. From 1958 to 2003, a resin compound manufacturing facility operated at this site. 7-ER-

1440. The facility reported that it used over 50 million pounds of VOCs annually, 6-ER-1316, including over 300,000 pounds of TCE in 1988 alone. 6-ER-1317. Century Corporation, the original owner of the SIC, declared bankruptcy in 2002, and the Saugus Industrial Center, LLC ("Saugus") purchased SIC in 2003, 5-ER-877, 891, and that same year entered into a voluntary cleanup agreement with the California Department of Toxic Substance Control ("DTSC"). 4-ER-639.

*The Flamingo Cleaners and Palace Dry Cleaners*—To the north and south of the wells at issue are additional potential sources of contaminants. To the north on the other side of the Santa Clara River and slightly to the east of the S-1 and S-2 wells is the former site of Flamingo Cleaners. 7-ER-1473. PCE, another volatile organic compound, is frequently used in dry cleaning, and Flamingo Cleaners may have been the source of VOCs found in the S-1 and S-2 wells. 6-ER-1275, 6-ER-1278, 6-ER-1285–86; 9-ER-2000–11. Another dry cleaner, Palace Dry Cleaners, at a site about two miles directly south of the S-1 and S-2 wells, was another potential source. 7-ER-1438

*The Bermite (Whittaker) Site*—Another potential source of contamination was a site, designated the Bermite site, located

primarily southeast of the S-1 and S-2 wells. *See supra* pp. 8-9; 7-ER-1438. The site, which was owned by the Bermite Powder Company from 1942 to 1967, is approximately 1,000 acres. 9-ER-1888, 1989. For over fifty years, from 1934 until 1987, it was used to manufacture fireworks, explosives, and munitions, first by Bermite's predecessors, then by Bermite, and after 1967 by Whittaker. 9-ER-1889; 8-ER-1770. After Whittaker ceased manufacturing operations in 1987, a commuter rail station was subsequently built on a 10-acre parcel on the northern border of the site, and the rest of the property was sold in 1999 to a brownfields developer for a mixed used development. 9-ER-1889; 8-ER-1770; 2-ER-135; 6-ER-1197–98.

### 3. Whittaker's Remediation of the Bermite Site

Whittaker has been remediating the Bermite site under the supervision of the DTSC and, to a lesser extent, the U.S. EPA for nearly four decades. In 1983, Whittaker informed DTSC's predecessor agency that it intended to cease operations on the site, and in 1987 it submitted a closure plan, which, after revisions, both the agency and the U.S. EPA accepted. 9-ER-1890.

In 1993, a number of hazardous substances were found on the Bermite site, including lead, lead azide, barium, copper, chromium,

zinc, tetrachloroethylene (commonly referred to as PCE), and TCE. 9-ER-1893. The following year Whittaker entered into a consent order requiring it to conduct a remedial investigation and feasibility study, and then formulate and implement a remedial action plan. 9-ER-1899–1903. During the remedial investigation, Whittaker found perchlorate, an oxidizer used to manufacture explosives and solid propellants such as rocket fuels, in soils and groundwater beneath the site. 6-ER-1185; 8-ER-1755–1825.

After Whittaker sold the Bermite site to a brownfields developer in 1999, the developer cleaned up about a quarter of the site before defaulting on its obligations in 2002. 6-ER-1197–98. DTSC then issued an imminent and substantial endangerment order requiring Whittaker to resume cleanup of the site. 7-ER-1324–1401; 9-ER-1989. The order divides the Bermite site into seven Operable Units, or "OUs," some with subdivisions. 7-ER-1340–42. The first six OUs concern soil areas on the surface of the site. *Id*. OU7, however, addresses groundwater contamination in both the Alluvium and the Saugus Formation, which extends underneath the site. 7-ER-1342.

In 2005, DTSC approved Whittaker's remedial action plan for OU1, which covers the easternmost portion of the Bermite site. 9-ER-

2028. For the next five years, Whittaker remediated this area, excavating and treating soil contaminated with perchlorate as well as installing soil vapor extraction systems to remove VOCs. In 2012, finding that Whittaker had excavated and treated over 393,000 cubic yards of perchlorate-contaminated soils and removed over 3,350 pounds of VOCs, DTSC concluded that Whittaker had successfully remediated OU1. 9-ER-2032–33; 6-ER-1301.

In 2010, DTSC approved Whittaker's remedial action plan for the remaining surface areas, OU2 to OU6. 8-ER-1694. From 2012 to 2019, Whittaker implemented these plans. In August 2020, finding that Whittaker had excavated and treated over 1.3 million tons of perchlorate-contaminated soil and removed over 55,000 pounds of VOCs through soil vapor extraction in these areas, DTSC concluded that Whittaker had completed the remediation of these areas. 9-ER-1992–93; 6-ER-1295–96, 6-ER-1297–98, 6-ER-1301–02.

Finally, DTSC approved the plan for remediating OU7 in 2014. 8-ER-1755–1825. Because OU7 concerns groundwater rather than surface areas, the objective of the remediation action plan for this unit was not only to clean up the groundwater underneath the Bermite site, but also to protect off-site groundwater supply wells, expressly

including the S-1, S-2, V-201 and V-205 wells. 8-ER-1765. Accordingly, Whittaker has installed groundwater extraction systems to remove perchlorate and VOCs from the groundwater as well as over 200 monitoring wells on and around the Bermite site. 2-ER-136–37. Whittaker has nearly completed remediation of OU7. 9-ER-1994–95; 6-ER-1296–97.

### B. Prior Disputes

Whittaker had two prior disputes with SCVWA's predecessors over contamination from the Bermite site.

In 1997 or 1998, perchlorate was discovered in wells owned by three of SCVWA's predecessors: Newhall County Water District, Santa Clarita Water Company, and Valencia Water Company. 6-ER-1192–93; 2-ER-128. In 2000, these entities and SCVWA's fourth predecessor, the Castaic Lake Water Agency, sued Whittaker, claiming that perchlorate from the Bermite site was contaminating the S-1, S-2 and two other wells. 5-ER-998–1000. In 2003, the Central District of California granted partial summary judgment on liability. 5-ER-1019, 1045. The parties subsequently settled, and Whittaker agreed to install a perchlorate treatment system for the S-1 and S-2 wells. 9-ER-1990; 6-ER-1195–96.

In 2010, perchlorate was discovered in the V-201 well, which was then owned by the Valencia Water Company, another SCVWA predecessor. 9-ER-1990. In 2015, Whittaker agreed to install a perchlorate treatment system for this well. *Id.*

## C. The Current Dispute

### 1. The Claims, Counterclaims and Cross-claims

In March 2018, SCVWA detected perchlorate in well V-205, the fourth well at issue in this suit, above the maximum contaminant level ("MCL") set by US EPA. 7-ER-1402–10. Five months later, SCVWA sued Whittaker, alleging that four wells—S-1, S-2, V-201 and V-205—had been contaminated with not only perchlorate but also the volatile organic compounds, TCE and PCE, from the Bermite site. 5-ER-1106–07. SCVWA asserted claims for negligence, nuisance, and trespass as well as violation of the Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code §§ 25300 *et seq*., under California law as well as violations of CERCLA and RCRA under federal law. 5-ER-1108–22. In addition to seeking injunctive and declaratory relief, SCVWA requested consequential and punitive damages. 5-ER-1122–25. SCVWA subsequently amended the complaint three times. *See* 5-ER-964–94 (third amended complaint).

15

Whittaker filed counterclaims for contribution and equitable indemnification under CERCLA. 4-ER-817–45. In addition, Whittaker sued the current and former owners of SIC, Saugus and Keysor-Century, for contribution and equitable indemnification. 5-ER-954–63, 4-ER-846–62, 4-ER-739–816. Whittaker alleged that the manufacturing facility at SIC had used over 50,000,000 pounds of VOCS annually, much of which was disposed in unlined ponds, which allowed both PCE and TCE to migrate into the groundwater accessed by SCVWA's wells. 4-ER-742, 747–48.

## 2. The SIC Settlement

Although SCVWA did not sue either Saugus or SIC's former owner, which by this time was insolvent, it entered into a settlement agreement with Saugus in which SCVWA agreed not to sue Saugus in exchange for a payment of $2.9 million by the owner and a promise to continue remediating the SIC property. 4-ER-666–68.

Afterwards, SCVWA and Saugus moved for approval of the settlement and to bar Whittaker's cross-claims against Saugus. 4-ER-612–37. SCVWA and Saugus argued that the settlement was in good faith because the $2.9 million paid by Saugus approximated its proportional share of SCVWA's damages. 4-ER-623–26. SCVWA

16

and Saugus pointed to SCVWA's amended disclosure asserting it would cost approximately $26.6 million to construct and operate treatment facilities for the S-1, S-2, V-201, and V-205 wells. 4-ER-630; 4-ER-640–41. Specifically, SCVWA estimated that it would cost just under $13 million to construct VOC treatment facilities at these wells and an additional $3 million for perchlorate treatment at well V-205:

**Construction Costs: SCVWA's Disclosures**

| Wells | Treatment | Amount |
|---|---|---|
| S-1 and S-1 | VOCs | $4.3 million |
| V-201 | VOCs | $4.3 million |
| V-205 | VOCs | $4.3 million |
| V-205 | Perchlorate (and VOCs) | $3.1 million |
| **Total** | | **$16.0 million** |

4-ER-656. The remaining $9 million or so in costs were for annual operation and maintenance. 4-ER-656–57.

The District Court granted the motion. 3-ER-601. It found the settlement amount reasonable because Saugus was likely to be held liable only for cleaning up the S-1 and S-2 wells, which with operation and maintenance expenses, the Court estimated would cost about $9 million. 3-ER-606. Even if Saugus were held responsible for

40% of that clean up, the Court reasoned, $2.9 million was a reasonable settlement of Saugus' liability. *Id*.

The District Court also held that the settlement funds should be allocated "pro tanto," and the judgment reduced by the amount of the settlement, rather than reducing the judgment "pro rata" according to Saugus' proportionate share of fault. 3-ER-608–09. The District Court rejected the pro rata approach because it found no "convincing evidence that the pro tanto approach will result in [Whittaker] paying more than its proportionate share." 3-ER-609.[3]

### 3. SCVWA's Restoration Costs Theory

*Rule 26(a) Disclosures*—As noted above, in its Rule 26(a) disclosures, SCVWA stated that it would be seeking to recover the costs of constructing and operating groundwater treatment facilities for the wells at issue. 2-ER-121–25. SCVWA did not identify these expenses as restoration costs. To the contrary, it indicated that it

---

[3] This determination was seriously flawed, as SCVWA later submitted a new expert report that increased its estimate of costs for the treatment facility from $26.6 million to $64.6 million. 9-ER-1991. As a result, Saugus paid less than 4% of the $75.3 million awarded by the jury, notwithstanding that the jury determined Saugus' liability to be 30%. 2-ER-175.

would be installing this equipment because the wells are "subject to DDW 97-2005 permitting requirements." 2-ER-123.

*The Motion in Limine and the Pretrial Conference*—On July 23, 2021, after the close of discovery, Whittaker filed a motion in limine to preclude SCVWA from offering evidence concerning the cost of constructing groundwater treatment facilities. 3-ER-588–600. Whittaker argued that SCVWA was seeking to install VOC treatment facilities on the basis that the California Department of Drinking Water ("DDW") would require the facilities, but that there was no evidence the DDW would impose this requirement. 3-ER-590–91. Whittaker therefore argued that evidence concerning treatment measures that might be required was speculative and should be excluded. 3-ER-591–92.

The District Court tentatively granted Whittaker's motion on August 12, 2021, finding that "[w]hile DDW may ultimately require [SCVWA] to treat its groundwater, it has not yet done so—and [SCVWA] has not pointed the Court to any evidence that it will do so," and thus "any discussion of the costs of that treatment appears speculative at this stage." 3-ER-503.

On August 13, 2021, while the motion in limine was pending, the pretrial conference was held. During the conference, SCVWA "shifted to a new legal theory," arguing that it could seek the costs of constructing groundwater treatment facilities under a "theory of 'restoration damages.'" 3-ER-386. Later that day, the District Court issued an order stating that it "was inclined to grant [Whittaker's] motion," but would defer ruling on the treatment facility costs in light of SCVWA's argument at the pretrial conference. 3-ER-406.

Finally, on August 26, 2021, the District Court denied Whittaker's motion. 3-ER-386. The Court recognized that SCVWA "has made deciding this issue needlessly difficult by continuously moving the target explaining the legal relevance of the evidence." 3-ER-385. However, the Court held that Whittaker was not prejudiced by SCVWA's belated introduction of a new damages theory because it had previously disclosed that it would seek to recover the costs of the groundwater treatment facilities. *Id.* Whittaker sought reconsideration of this order, 3-ER-322–37, which was denied, 2-ER-302.

*The Jury Instructions*—After denial of Whittaker's motion to reconsider, SCVWA first proposed an instruction on restoration costs.

*Compare* 2-ER-287 *with* 3-ER-471 and 3-ER-574. The standard California instruction informs the jury what to do if restoration or repair costs are unreasonable. *See* CACI Instruction 3903F. SCVWA, however, omitted this portion of the instruction. 2-ER-287. By contrast, Whittaker proposed the standard instruction including this statement. 2-ER-292.

The District Court adopted, with a slight modification, SCVWA's proposed instruction. 2-ER-181–83. It offered no reason for not instructing the jury on what to do if it found the restoration costs sought by SCVWA unreasonable.

### 4. The Trial and the Judgment

At trial, SCVWA presented evidence that Whittaker produced munitions, explosives, and related materials at the Bermite site. 6-ER-1133. It also presented evidence that perchlorate, TCE, and PCE were improperly disposed of at a number of sites, including a 1979 internal Whitaker memorandum stating that "indiscriminate dumping" was occurring at the Bermite site, 8-ER-1753–54. SCVWA also suggested that before Whittaker began remediating the site under DTSC supervision it misled U.S. EPA officials regarding its waste disposal practices. 6-ER-1188–89. Finally, SCVWA presented evidence that

the chemicals released by Whittaker made their way into the groundwater underneath the Bermite site and from there migrated to the groundwater underneath its wells. 2-ER-128.

With respect to damages, SCVWA presented testimony concerning costs of water purchased to replace groundwater water it was no longer able to extract and to blend with extracted groundwater to dilute VOC concentrations. 6-ER-1146–68; 9-ER-1988. More importantly, SCVWA presented testimony from an expert, Dr. Issam Najm, concerning the costs of constructing and operating groundwater treatment facilities. 6-ER-1209–71. Dr. Najm testified that activated carbon or GAC treatment is an appropriate method for treating VOCs and that constructing facilities for such treatment at wells S-1, S-2, V-201, and V-205, as well as perchlorate treatment at V-205, would cost over $30 million dollars:

**Construction Costs: Dr. Najm's Testimony**

| Wells | Treatment | Amount |
|---|---|---|
| S-1 and S-1 | VOCs | $7.6 million |
| V-201 | VOCs | $5.5 million |
| V-205 | VOCs and perchlorate | $17.3 million |
| **Total** | | **$30.4 million** |

6-ER-1229–30. Dr. Najm estimated that operation and maintenance of these facilities for 30 years would cost $34.2 million, making the net

cost of constructing and operating the groundwater treatment facilities proposed by SCVWA $64.6 million. 6-ER-1232–35.

*The Jury's Verdict*—On December 3, 2021, after 11 days of trial, the jury denied SCVWA's punitive damages claims, finding that Whittaker had not acted with malice, oppression, or fraud. 2-ER-175. However, it found Whittaker liable for public and private nuisance, trespass, and negligence. 2-ER-170–73. The jury awarded SCVWA $7 million in past damages and $68.3 million in restoration costs. 2-ER-175; *see also* 2-ER-143 (suggesting that the jury included $3.7 million in projected replacement and blend water costs in the restoration costs award). Finding both SCVWA and Saugus negligent, the jury assigned 30% of the fault to Saugus, 10% to SCVWA, and 60% to Whittaker. 2-ER-175.

*The JMOL Order*—The District Court subsequently granted Whittaker judgment as a matter of law on SCVWA's trespass and private nuisance claims because SCVWA failed to present sufficient evidence of an interest in the land. District Court Dkt. 523 at 4-7.

*The District Court's Findings of Fact and Conclusions of Law*—In June 2022, the District Court issued findings and facts and conclusions of law concerning SCVWA's statutory claims. 2-ER-

126–67. Under CERCLA, it awarded SCVWA response costs of $675,000 arising from investigation, permitting and design costs, reduced to $607,500 in light of SCVWA's fault, 2-ER-141, 167, but denied recovery for replacement and blend water costs because they would be duplicative of the damages already awarded. 2-ER-140–49.

The District Court also denied SCVWA's RCRA claim because SCVWA failed to prove any imminent and substantial endangerment. 2-ER-159–63. The Court found there had been "substantial remediation and containment efforts for years" at the Bermite site "subject to close and extensive government oversight." 2-ER-160. It also found that in multiple reports SCVWA had represented to the public that there were only trace amounts of TCE and PCE in the groundwater it used, that this did not affect the safety of the drinking water SCVWA supplied, and that the threat of harm was "speculative. 2-ER-161–62. Indeed, the Court observed, "[t]he ongoing work to address groundwater contamination" had resulted "in the delivery of safe water to the community for years." 2-ER-162.

*The Judgment*—On June 28, 2022, the District Court entered judgment. 1-ER-33–35. It reduced the damages award by 10% to reflect SCVWA's contributory negligence and by $2.9 million to

reflect SCVWA's settlement with Saugus. 1-ER-35. As a consequence, the Court awarded SCVWA $64,870,000 in damages. *Id*. The Court also awarded SCVWA $607,500 in response costs under CERCLA as well as $494,701.72 in prejudgment interest, *id*., bringing the total judgment to $65,972, 201.72. *Id*.

*The Initial Appeals*—Whittaker appealed the judgment, 9-ER-2040–44, and SCVWA cross-appealed. 9-ER-2050–54. SCVWA also later appealed from the denial of its motion for attorney's fees. 9-ER-2045–49.

### 5. The Post-Judgment Motions

The parties also filed post-judgment motions. On December 28, 2022, the District Court denied Whittaker's motion for judgment as a matter of law or a new trial, 1-ER-6–17, but granted in part SCVWA's motions to amend and for a new trial, reinstating the jury's verdict on private nuisance (but not negligence), 1-ER-17–26, and ordering pre-judgment interest recalculated, 1-ER-27–32; *see also* 1-ER-3 (awarding $2,938,567.83 in pre-judgment interest).

In denying Whittaker's motion for judgment as a matter of law, the District Court acknowledged that SCVWA's Rule 26(a) disclosures did not mention its restoration costs theory, but held that

SCVWA was not required to disclose its damages theory. 1-ER-9. The Court also ruled that Whittaker had not shown any prejudice from SCVWA's failure to disclose its restoration costs theory before the close of discovery, reasoning that "the relevant facts were known by Defendant and the relevant law was equally available" to it. *Id*.

In addition, the District Court upheld the jury's restoration costs award. In response to Whittaker's objection that SCVWA had presented no evidence that the proposed groundwater treatment facilities would restore the groundwater to its condition prior to injury, 2-ER-96–98, the District Court asserted that "California law does not rigidly define repair costs to be limited to restoring the real property to its original condition." 1-ER-12. The Court also asserted that SCVWA had shown that "treatment of the water would restore it to … the position it would have occupied had Defendant not contaminated the groundwater" based on evidence that treatment would "remove from its supply wells the contamination caused by Plaintiff." 1-ER-13.[4]

---

[4] The District Court also discussed the jury instructions at length, 1-ER-10–14, which is puzzling given that Whittaker's arguments were based on the sufficiency of the evidence. 2-ER-96–98; 2-ER-48–50.

On January 11, 2023, the District Court entered an amended judgment, 1-ER-2–5, and Whittaker filed an amended notice of appeal, 9-ER-2035–39.

## SUMMARY OF ARGUMENT

1.     SCVWA did not satisfy its disclosure obligations under Federal Rule of Civil Procedure 26 with regard to its restoration costs theory of damages. It did not assert this theory until a pretrial conference after the close of discovery. This belated disclosure was not justified because it was based on information that was known at the time that SCVWA made its initial Rule 26 disclosures and its three amendments of those disclosures. Rather, SCVWA asserted the restoration cost damages theory after the District Court cast doubt on the speculative nature of its original damages theory. Federal courts have consistently held that failure of a theory is not justification for not disclosing an alternative theory; if evidence supporting multiple theories is known at the time that Rule 26 disclosures are made, they should all be disclosed.

SCVWA's failure to disclose that it was seeking restoration costs until after the close of discovery prevented Whittaker from preparing expert testimony to rebut this theory. Restoration costs are a

unique, alternative measure of damages that are only appropriate if certain requirements are met, including that the award be reasonable in comparison to both the property's original condition and the harm caused by the defendant. Under SCVWA's original damages theory, based on whether or not DDW would require the requested treatment, Whittaker had no reason to take discovery regarding the requirements for restoration costs. Rather, it focused its discovery on the speculative nature of SCVWA's assertions regarding what DDW would require.

The District Court erred in allowing SCVWA to present evidence supporting a restoration costs theory of damages, and the more than $60 million restoration costs award should be vacated.

2.      Even if SCVWA had disclosed its restoration costs theory in a timely manner as required by the Federal Rules of Civil Procedure, the evidence it presented failed to establish that the groundwater treatment facilities it seeks to build constitute recoverable restoration costs. California courts have held that repair and remediation costs only qualify as restoration damages if they return the injured property to its pre-injury condition. Yet, SCVWA did not show that the treatment facility it seeks would restore the groundwater used by

SCVWA to its condition before contamination from the Bermite site. SCVWA's expert testified that the proposed treatment facilities would remove VOCs from groundwater for distribution, but did not even attempt to establish the original condition of the groundwater, let alone that the treatment facilities would restore the groundwater to that condition. The District Court thus erred in awarding restoration costs to SCVWA.

3.      SCVWA also failed to prove that the costs of the treatment facilities for VOCs are reasonable relative to the minimal harm caused by VOC contamination at its wells. Under California law, restoration costs must be reasonable in relation to the actual damage sustained. Here, undisputed evidence showed that VOCs caused little harm to SCVWA's groundwater. There is no evidence that VOC levels have ever exceeded the relevant public health goals, SCVWA has continued to supply water to the public from the S-1 and S-2 wells, and the District Court found no "substantial endangerment to health and the environment" under RCRA.

More than $40 million in restoration costs for such limited harm is excessive and unreasonable.

## STANDARD OF REVIEW

This Court reviews evidentiary rulings, including the District Court's ruling not to exclude evidence pursuant to Rule 37, for abuse of discretion. *See, e.g.*, *Hoffman v. Construction Protective Servs., Inc.*, 541 F.3d 1175, 1178 (9th Cir. 2008). This Court reviews de novo the District Court's legal conclusions regarding the damages award, including its decision to award restoration costs when SCVWA failed to present any evidence that the groundwater treatment facilities it sought would restore the groundwater in question to its prior condition and its decision to award damages that are excessive relative to the contamination at issue. *See, e.g.*, *R.B. Matthews, Inc. v. Transamerica Transp. Services, Inc.*, 945 F.2d 269, 272 (9th Cir. 1991).

## ARGUMENT

### I. SCVWA SHOULD NOT HAVE BEEN PERMITTED TO SEEK RESTORATION COSTS AT TRIAL

All but a small portion of the damages awarded by the jury were for restoration costs. SCVWA, however, did not disclose that it would use restoration costs to measure its damages until after both fact and expert discovery had closed. There was no mention of restoration costs in any of SCVWA's four Rule 26 disclosures, its

interrogatory responses, or even its original jury instructions.[5] SCVWA did disclose that it would be seeking to recover the costs of constructing and operating treatment facilities, but it did so on the theory that DDW would require those facilities.[6] It was not until the pretrial conference in August 2021, after Whittaker had moved to exclude the evidence of these facilities on the ground that there was no evidence DDW would require them, 3-ER-588–92, that SCVWA first contended that these facilities constituted restoration costs. 3-ER-585–86.

SCVWA should not have been allowed to introduce a new theory of damages at such a late date. Rule 26 requires prompt disclosures to avoid exactly this sort of surprise. Moreover, SCVWA's belated change in its damages theory severely prejudiced Whittaker's ability to contest it. Restoration costs are an "alternative measure" of damages to property, which in some circumstances provides a better way to calculate the harm suffered than the primary measure of diminution in value. *Salazar v. Matejcak*, 245 Cal. App.

---

[5] 5-ER-1102–27, 5-ER-1076–1101, 5-ER-1046–75, 5-ER-964–94, 3-ER-415–87; 3-ER-369–80.

[6] 3-ER-339-52; 2-ER-307–20; 2-ER-108–12; 2-ER-114–19; 2-ER-121–25.

3d 634, 643 (2016). However, because restoration costs can be excessive or wasteful, this measure of damages is subject to several, largely unique restrictions. By not disclosing that it would seek to use restoration costs to measure its damages, SCVWA prevented Whittaker from developing evidence concerning those restrictions, enabling SCVWA to unfairly obtain a massive restoration costs award.

### A. The District Court Erred in Permitting SCVWA to Assert a Restoration Costs Theory at Trial that It Had Failed to Disclose in Discovery

The Federal Rules require prompt disclosure of damages in order to prevent precisely such unfairness. Rule 26 requires parties to make initial disclosures that include "a computation of each category of damages claimed" and make available "the documents … on which each computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii). Moreover, if these initial disclosures are incomplete, they must be supplemented "in a timely manner," Fed. R. Civ. P. 26(e)(1)(A). If a party fails to make the required disclosures, it is prohibited from presenting evidence at trial concerning the undisclosed information "unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1); *see also Yeti by Molly, Ltd. v. Deckers Outdoor*

*Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (noting that Rule 37 is "a self-executing, automatic sanction").

The District Court should have applied this sanction and barred SCVWA from asserting restoration costs at trial.[7] SCVWA failed to include restoration costs in its initial disclosures or any of its supplemental disclosures, and this failure was neither justified nor harmless.

### 1. SCVWA Did Not Disclose Its Restoration Costs Theory Until After the Close of Discovery, in Violation of Its Obligations under Rule 26(a)

As noted above, SCVWA did not mention its restoration costs theory in its initial disclosures or any of its supplemental disclosures. *See supra* pp. 30-31. Indeed, SCVWA did not alert Whittaker to its restoration costs theory until the pretrial conference, after the close of both fact and expert discovery, and only about three months before trial was scheduled to begin. 3-ER-385–86. That was too late. The Federal Rules require initial disclosures to be made within 14 days of the parties Rule 26(f) conference, Fed. R. Civ. P. 26(a)(1)(C), and it requires that any information omitted from those disclosures be

---

[7] In the District Court proceedings, Whittaker raised the argument that SCVWA violate Rule 26 in connection with its first motion in limine. 3-ER-334–35.

supplemented "in a timely manner" after learning of the omission, Fed. R. Civ. P. 26(e)(1). A disclosure made after the close of discovery is plainly not timely.

The District Court found no violation of Rule 26 on the ground that SCVWA was required only to disclose its computations of the expense of the treatment facilities and not that it was seeking these costs as restoration costs. 1-ER-9. That is wrong. Rule 26 does not just require disclosure of calculations: it requires disclosure of "a computation of each *category* of damages claimed." Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis added). To disclose the "category" of damages, a party must identify that category—that is, the type or nature of the damages, whether they are reliance, expectation, emotional distress, lost profits, loss of use, diminution in value, or restoration costs. The purpose of initial disclosures, after all, is "to accelerate the exchange of basic information about the case and to eliminate the paper work involved in requesting such information." Fed. R. Civ. P., 1993 Adv. Comm. Notes. As a consequence, it makes no sense to interpret Rule 26(a) to require disclosure of the computation of damages without identifying the type or nature of the

damages—omitting that information would require the very sort of follow-up requests that initial disclosures are intended to avoid.

In ruling that SCVWA was not required to disclose the type of damages it was seeking, the District Court cited two district court opinions holding that Rule 26 does not require the disclosure of a plaintiff's "legal theory." 1-ER-9 (citing *Athena Cosms., Inc. v. AMN Distribution Inc.,* 2022 WL 4596549 (C.D. Cal. Aug. 16, 2022), and *Estakhrian v. Obenstine*, 233 F. Supp. 3d 824 (C.D. Cal. 2017)). Neither opinion, however, addressed whether a plaintiff may satisfy Rule 26 by disclosing damage computations without identifying the nature or type of the damages sought. In one case, the Court considered whether the plaintiff was required to disclose the legal theory on which it claimed the defendant had breached a contractual duty to disclose its suppliers. *See Athena Cosmetics, Inc*., 2022 WL 4596459, at *6; *see also id*. at *1 (discussing the contract and the claim of breach). Far from suggesting that a plaintiff may satisfy Rule 26 by disclosing computations of damages without identifying the nature of the damages, the district court noted that Rule 26 does not require parties to disclose their counsel's mental impressions and legal theories. *Id*. at *6 (citing Fed. R. Civ. P. 26(b)(3)(B)). In the second

opinion, the district court denied the defendant's request to exclude a supposedly new theory of disgorgement because the defendant "has long been on notice of plaintiffs' claim for disgorgement and the grounds for that claim." *Estakharian*, 233 F. Supp.3d at 837 n.11; *see also id.* (refusing to preclude a new "theory *of liability* premised on … unlawful and unethical practice of law") (emphasis added).

Where courts have squarely addressed the issue, they have concluded that Rule 26 requires disclosure of the nature and type of damages as well as bare computation of them. Much like here, in *Munro v. Univ. of S. Cal.*, 2023 U.S. Dist. LEXIS 9707 (C.D. Cal. Jan. 19, 2023), the plaintiffs attempted to change the theory behind their damages calculation after the court excluded the expert testimony supporting their original theory. *Id.* at *25-26. In their Rule 26(a) disclosure and interrogatory responses, the plaintiffs had maintained that their damage calculations would be based on expert analysis, but after their expert testimony was excluded, the plaintiffs sought to shift to a new theory using different evidence. *Id.* at *27-28. The court found that the "[d]efendants were justified in concluding that Plaintiffs would not seek to prove … losses using alternative theories," and so "Plaintiffs' introduction of a new theory of … losses

… over four months after the expert discovery deadline and approximately one month before trial—not only caused surprise, but also prejudice." *Id.* at *28. The court concluded that "Rule 37 bar[red] Plaintiffs' proposed new evidence of … losses that were not timely disclosed in accordance with Rule 26(a)." *Id.* at *29.

Likewise, in *King v. Wang*, 2021 WL 5299917 (S.D.N.Y. Nov. 15, 2021), the plaintiff asserted a new theory of damages, based on disgorgement of illicit profits received at an auction, for the first time prior to trial. *Id*. at *2. When the defendant objected that this theory had not been disclosed previously, the plaintiff responded that "the evidence underlying this theory had been repeatedly disclosed." *Id.* at *3. The court rejected this argument. "The question," it explained, "is not simply whether Plaintiff will rely on new evidence but whether its reliance on old evidence to assert a new theory would require new evidence on the part of Defendants and thus cause prejudice to Defendants." *Id*. Finding that this damages theory was not disclosed, and that "Defendants were entitled to rely on the theory and the categories of damages disclosed by Plaintiff in Rule 26(a)(1) statement," the Court held that the plaintiff had violated Rule 26. *Id*. at *4.

Similarly, here, although SCVWA disclosed its computation of the costs of groundwater treatment facilities, it violated Rule 26 by not timely disclosing that it would seek to recover them as restoration costs.

### 2. SCVWA's Failure to Timely Disclose Its Restoration Costs Theory Was Unjustified

SCVWA's violation of Rule 26 was unjustified. SCVWA changed its damages theory only because Whittaker demonstrated that its original theory failed. 3-ER-406. SCVWA initially claimed that it was entitled to recover the costs of constructing and operating groundwater treatment facilities "based on its assumption that DDW will ultimately require [SCVWA] to treat groundwater that has been contaminated with VOCs." 3-ER-407. This theory failed because, as the District Court found, "[w]hile DDW may ultimately require [SCVWA] to treat its groundwater, it has not yet done so—and [SCVWA] has not pointed the Court to any evidence that it will do so." 3-ER-406. SCVWA only pivoted to its restoration costs theory after this ruling. *See supra* pp. 19-20. The failure of its original damages theory, however, is not a "substantial justification" under the Federal Rules for failing to timely disclose an alternative theory.

To the contrary, courts repeatedly have held that the failure to disclose a theory is not justified by the rejection of an alternative theory. *See, e.g.*, *US Salt, Inc. v. Broken Arrow, Inc.*, 2008 WL 2277602, at \*5 (D. Minn. May 30, 2008) (prior "strategic decision to seek only lost profits as damages" is not an excuse for failing to disclose alternative theories); *United States v. 14.3 Acres of Land*, 2011 WL 2414348, at \*5 (S.D. Cal. June 10, 2011) ("Adverse Court Ruling is Not Justification for Supplementation") (emphasis omitted); *see also Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2017 WL 3016385, at \*3 (N.D. Ind. July 17, 2017) (plaintiff's attempt to provide alternative computation of damages 18 months after the close of discovery and only after the court excluded its expert's testimony on damages was not justified).

Far from permitting SCVWA to introduce alternative theories as it deemed them needed, the Federal Rules required SCVWA to timely disclose all of its alternative theories in order to avoid precisely the type of prejudice that Whittaker suffered here—being foreclosed from developing evidence regarding critical elements of a restoration damages theory.

### 3. SCVWA's Failure to Timely Disclose Its Restoration Costs Theory Prejudiced Whittaker

Whittaker was severely prejudiced by SCVWA's belated disclosure of its theory of damages because it was prevented from developing evidence concerning the special requirements and restrictions placed on restoration costs.

As noted above, *see supra* pp. 31-31, restoration costs—the "cost of restoring the property to its condition prior to the injury"— are only an alternative measure of damages to property. *Salazar*, 245 Cal. App. 3d at 643. The primary measure of such damages is diminution in value, "the difference between the value of the property before and after injury." *Id.* Restoration costs are appropriately used in situations where they provide a better way to "fix appropriate compensation for the plaintiff's loss." *Id.* (quotation omitted); *see generally Massachusetts Port Auth. v. Sciaba Constr.*, 766 N.E.2d 118, 124-25 (Mass. Ct. App. 2002). For example, the diminution-in-value measure may overestimate damages where the market value fails to recognize that damaged property may be cost-effectively repaired. *See* Dan B. Dobbs & Caprice L. Roberts, *Dobbs on Remedies* § 5.2940 (3d ed. 2018). Conversely, diminution in value

may underestimate damages where the plaintiff has a "personal reason" to restore the damaged property not reflected in the property's market value. *See, e.g., Kelly v. CB&I Constructors, Inc*., 179 Cal. App. 4th 442, 454 (2009); *Heininger v. Dunn*, 101 Cal. App. 3d 858, 862 (1980). As a consequence, whenever used, there is a threshold question whether restoration damages are appropriate for measuring the damages in question.

Restorations costs, however, create a danger of economic waste and unwarranted windfalls. *Safeco Ins. Co. v. J& D Painting*, 17 Cal. App. 4th 1199, 1202-03 (1993). *See generally Dobbs on Remedies* § 5.2(1), at 510. Thus, even where restoration costs are appropriate, they are subject to two additional restrictions. First, because the primary object of damages is to provide "*just compensation* or indemnity for the loss of injury sustained by the complainant *and no more*," *Mozzetti v. City of Brisbane*, 67 Cal. App. 3d 565, 576 (1997) (quotation omitted), restorations or repairs cannot improve a property and make it better than before it was damaged. Instead, restoration costs must return damaged property to its "condition prior to the injury." *Salazar*, 245 Cal. App. 4th at 644. Second, to ensure that restoration costs are not wasteful and impractical, they must be reasonable and cannot be

disproportionate to either "the value of the property or the harm caused by the defendant." *Id.* at 644.

By allowing SCVWA to assert restoration costs at trial without disclosing that it would do until after the close of discovery, the District Court severely prejudiced Whittaker's ability to develop evidence concerning the restrictions on restoration costs. For example, the most fundamental factor in determining whether restoration costs are appropriate is whether they exceed the diminution in value of the property at issue. *See, e.g.*, *Starrh I*, 153 Cal. App. 4th at 599 (As a general rule, "if the cost of restoration will exceed the diminution in value, then the diminution in value is the proper measure"); *Green v. General Petroleum Corp.*, 205 Cal. 328, 336 (1928) (same). However, because SCVWA did not indicate that it intended to use restoration costs to measure damages until after the close of expert discovery, Whittaker had no reason to retain an expert to testify concerning the diminution in the value of the groundwater used by SCVWA as a result of contamination from the Bermite site.

Nor did Whittaker have an opportunity to develop testimony concerning a critical element needed to prove restoration damages—the original condition of the property. Without evidence of the

original condition of the property, it is impossible to determine what level of compensation returns the plaintiff to that original state. And until SCVWA asserted restoration costs, Whittaker had no reason to investigate whether the groundwater treatment facilities that SCVWA seeks to construct would return the groundwater it treats to the condition in which it would have been absent contamination from the Bermite site. To the contrary, under SCVWA's initial theory, Whittaker's responsibility for such costs hinged on whether DDW would require such facilities—an issue on which Whittaker quite successfully marshalled evidence. *See supra* p. 38. Similarly, Whittaker had no opportunity to develop evidence concerning the reasonableness of the costs of the treatment facilities in comparison to either the absolute value of the groundwater prior to contamination or its diminution in value afterwards.

Courts routinely find that a party's failure to disclose was not harmless where, as here, it prevented the other party from adequately preparing its case or contesting damages claims. *See, e.g.*, *Munro*, 2023 U.S. Dist. LEXIS 9707, at *28 (failure to disclose caused prejudice because "Defendants were entitled to know the type or types of damages [Plaintiff] sought so that they could prepare rebuttal

evidence") (quotation marks omitted); *Krause v. City of Mohave*, 459 F. Supp. 3d 1258, 1270 (D. Az. 2020) (failure disclose was not harmless where "Defendants had little opportunity to cure the prejudice" because the "surprise testimony" "came *four days* prior to closure of all discovery and months after Plaintiff's initial expert disclosure deadline") (emphasis in original); *Silvagni v. Wal-Mart Stores, Inc.*, 2017 WL 5100162, at *2 (D. Nev. Nov. 2, 2017) ("[I]t is clear that the failure [to disclose] was neither substantially justified nor harmless because, *inter alia*, a Rule-compliant computation has still not been provided long after the close of discovery and Defendant has been prejudiced thereby in its ability to prepare its challenge to this particular damages claim."); *Agence France Presse v. Morel*, 293 F.R.D. 682, 686 (S.D.N.Y. 2013) (noting that "courts have readily imposed sanctions where a party's failure to disclose its damages theory in a timely manner prevented its adversary from pursuing discovery targeted at that theory").

The District Court found that Whittaker was not prejudiced because it disclosed the costs of the treatment facilities it now seeks as restoration costs in its initial disclosures. 1-ER-9. That ignores the prejudice that Whittaker suffered from being unable to contest other

matters such as (1) whether restoration costs were an appropriate measure for the damages here, (2) whether the groundwater treatment facilities would restore the original condition of the groundwater and thus constitute genuine restoration costs, and (3) whether the size of the restoration costs are reasonable in relation to the value of the groundwater in question or the harm to it. The District Court erred in focusing on solely on the estimate of the costs of the proposed facilities and ignoring the restrictions on restoration costs.

As a consequence, the District Court erred in allowing SCVWA to seek restoration damages. *See Yeti by Molly*, 259 F.3d at 1106; *see also Brumer v. Gray*, 2019 WL 2552201 (D. Nev. June 20, 2019) (excluding future damages theory when theory was "newly disclosed on the last day of discovery"); *Austrian Airlines Oesterreichische Lufverkehrs AG v. UT Fin. Corp.*, 2005 WL 977850, at *1-2 (S.D.N.Y. Apr. 28, 2005) (precluding plaintiff's "new, additional damage theory at the eleventh hour").

### B. Alternatively, the District Court Abused Its Discretion in Denying Whittaker's Motion in Limine to Preclude Evidence of Restoration Costs

Even if Rule 26 had not required SCVWA to disclose that it would seek restoration costs, the District Court abused its discretion in

not excluding the evidence of such costs in light of the prejudice to Whittaker from SCVWA's belated disclosure that it would seek such costs. *See Grouse River Outfitters Ltd. v. Oracle Corp.*, 848 Fed. App'x 238 (9th Cir. 2021) (district court's ruling on motion in limine reviewed for abuse of discretion even where discovery sanctions are at stake). Even in the absence of Rule 37(c)'s automatic exclusion rule, the District Court had the authority to preclude SCVWA from adding a new damages theory after the close of discovery. *See, e.g.*, *Matrix Int'l Textile, Inc. v. Monopoly Textile, Inc.*, 2017 WL 2929376, at *1 (C.D. Cal. May 12, 2017) ("Trial courts have broad discretion when ruling on motions in limine."). The District Court refused to exercise that discretion on the ground that Whittaker was aware that SCVWA was seeking to recover the costs of constructing and operating groundwater treatment facilities and therefore suffered no prejudice from the belated change. 3-ER-386. As shown above, in so doing, the District Court impermissibly ignored the prejudice to Whittaker that was caused by precluding Whittaker from establishing evidence regarding restoration damages. *See supra* pp. 42-45. Consequently, even if Rule 37(c) does not apply here, the District Court abused its

discretion in denying Whittaker's motion in limine under these circumstances.

## II. SCVWA FAILED TO PRESENT EVIDENCE OF GENUINE RESTORATION COSTS

Even if SCVWA had timely asserted restoration costs, and given Whittaker a fair opportunity to develop evidence opposing them, the restoration costs awarded SCVWA still would have to be vacated because SCVWA failed to establish that the groundwater treatment facilities it seeks to build are genuine restoration costs that are an appropriate measure of its damages.

### A. Repairs and Remediation Efforts Qualify as Restoration Costs Only If Those Efforts Return Injured Property to Its Condition Prior to Injury

Even where restoration costs are an appropriate measure of compensatory damages, plaintiffs are not then entitled to recovery of all repairs or renovations that they may wish to make. To the contrary, because restoration costs measure compensatory damages, they are limited to repairs or renovations that merely restore property to its condition prior to injury.

Under California law, the primary object of tort damages is to provide "*just compensation* or indemnity for the loss or injury

sustained by the complainant, *and no more*." *Mozzetti v. City of Baltimore*, 67 Cal. App. 3d 565, 576 (1977) (citing *Estate of de Laveaga*, 50 Cal. 2d 480, 488 (1958)). Accordingly, in awarding damages, "[a] plaintiff in a tort action is not … to be placed in a better position than he would have been had the wrong not been done." *Metz v. Soares*, 142 Cal. App. 4th 1250, 1255 (2006) (quoting *Valdez v. Taylor Automobile Co*., 129 Cal. App. 2d 810, 821-22 (1954)).

These general principles apply to restoration costs. In considering restoration costs, California courts have recognized that "damages may cover the loss or injury sustained and no more." *Starrh I*, 153 Cal. App. 4th at 176 (citing *Estate of de Laveaga*, 50 Cal.2d at 488); *Mozzetti*, 67 Cal. App. 3d at 576. In addition, whether restoration costs or another method is used to measure damages, a plaintiff "is not … to be placed in a better position than he would have been had the wrong not been done." *Safeco Ins. Co. v. J&D Painting*, 17 Cal. App. 4th 1199, 1202 (1993) (quoting *Valdez*, 129 Cal. App. 2d at 821-22). Thus, restoration costs cannot be used to put a plaintiff "in a better position than he would have been had no wrong had been done." *Safeco*, 17 Cal. App. 4th at 1202. Instead, restoration costs should "compensate the injured party for the loss sustained" from

48

damaged property by determining "the cost of restoring the property to its condition prior to the injury." *Salazar*, 245 Cal. App. 3d at 644 (quotation marks omitted).

Accordingly, California courts have long recognized that restoration costs must be calibrated so that they do not place tort plaintiffs in a better position than before. Tort plaintiffs may be awarded the costs of restoring damaged property to its "*former condition*," *Geddes & Smith Inc. v. St. Paul Mercury Indem. Co*., 63 Cal. 2d 602, 604-05 (1965) (emphasis added); *see Linforth v. San Francisco Gas & Elec. Co*., 156 Cal. 58, 62 (1909) (quotation omitted), its "*original condition*," *Herzog v. Grosso*, 41 Cal. 2d 219, 220 (1953) (emphasis added); *see Green v. General Petroleum Corp*., 205 Cal. 328, 336 (1928); *Mozzetti*, 67 Cal. App. 3d at 576, or its "*condition prior to the injury*." *Salazar*, 245 Cal. App. 4th at 644 (emphasis added) (quotation omitted); *Heninger v. Dunn*, 101 Cal. App. 3d 858, 862 (1980); *see also Kelly v. CB&I Constructors*, 179 Cal. App. 4th at 450 ("pretrespass condition") (emphasis added).[8]

---

[8] This is not to say that restoration costs may be used to measure damages only when repairs or remediation efforts return damaged property to its exact condition prior to injury. Where repairs do not restore damaged property to that condition, plaintiffs may recover any

This requirement for restoration costs applies to damages from groundwater contamination as well as other causes. *See Starrh I*, 153 Cal. App. 4th at 599 ("costs of repairing the injury and restoring the premises to their original condition" may be recovered when less than the property's diminution in value"); *see also State v. Diamond Lakes Oil Co.*, 347 Ark. 618, 626 (2002) ("[T]he measure of damages is the cost of restoring the property to the same condition that it was in prior to the injury.").

Thus, under California law, SCVWA may use the costs of repairs and remediation efforts as restoration costs to measure damages only if those costs return the injured property to its condition prior to injury.

---

diminution in value remaining after the repairs. *See Merchant Shippers Ass'n v. Kellog Express & Draying Co.*, 28 Cal. 2d 594, 600-02 (1946); *Safeco Ins.*, 17 Cal. App. 4th at 1204. Similarly, where repairs make property better than before injury, other jurisdictions have held that repairs may be recovered as restoration costs so long as the value of the improvement is deducted from the award. *See, e.g.*, *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir. 1976).

### B. SCVWA Did Not Show that the Treatment Facilities It Seeks Would Restore Groundwater to Its Condition Absent Contamination from the Bermite Site

SCVWA did not show that the groundwater treatment facilities it seeks to construct would return the groundwater at issue to its condition absent contamination from the Bermite site.[9] Although SCVWA presented expert testimony concerning how much it would cost to construct groundwater facilities, it presented no evidence that these facilities would return the groundwater to its condition absent the injury at issue and thus are genuine restoration costs that measure damages.

The jury's restoration costs award was based on estimates by plaintiff's expert Dr. Najm of the cost to construct and operate groundwater treatment facilities for four wells. *Compare* 9-ER-1991 and 6-ER-1228–35 *with* 2-ER-174. But Dr. Najm did not testify that these facilities would restore the groundwater under SCVWA's wells to their condition absent any contamination from the Bermite site.

---

[9] In the District Court proceedings, Whittaker raised the argument that SCVWA failed to present evidence showing that the proposed treatment facilities would restore original conditions in its Rule 50(a) motion. 2-ER-199.

Indeed, in his testimony Dr. Najm did not even mention the condition of the groundwater. 6-ER-1209–71.

Rather than asking Dr. Najm to testify whether the contemplated treatment facilities would return the groundwater in question to its condition absent injury, SCVWA simply asked "whether an activated carbon or GAC treatment is an appropriate and effective treatment for removing VOCs from water." 6-ER-1209. He therefore testified only that GAC treatment is an appropriate treatment in general, not that it measures the damages caused by contamination from the Bermite site:

> Q.  And so with the respect to that first question as to whether this carbon this GAC treatment is an appropriate system in this case, did you reach a [] conclusion?
>
> A.  Yes, I did.
>
> Q.  And can you describe for us what your conclusion is in that regard?
>
> A.  Yes. I concluded that granular activated carbon is very much an appropriate and effective technology from removing TCE and PCE from water.

6-ER-1226; *see also* 6-ER-1227 ("[A]ctivated carbon is defined by the U.S. EPA as a best available technology for VOC removal, and VOC includes TCE and PCE.")

In fact, there is no evidence that Dr. Najm was even aware of the condition of the groundwater used by SCVWA prior to contamination from the Bermite site. Dr. Najm testified that, in determining the number of filters that needed to be installed, he examined the levels of VOCs at the wells from 2016 to 2021. 6-ER-1222–24, 6-ER-1250. However, he offered no opinion about where these chemicals came from. 6-ER-1225. As a consequence, there is no evidence that the treatment facilities contemplated by Dr. Najm would restore the groundwater to its condition absent injury rather than some better condition and thus measure damages.

Indeed, there is undisputed evidence that a substantial portion of the contamination in the groundwater under SCVWA's wells was not from the Bermite site. Those wells are located in a region with significant industrial activity and even oilfields. 8-ER-1690; *see also supra* p. 9. Some of the VOCs found in the wells were not present on the Bermite site and thus must have come from elsewhere. 6-ER-1321–22. And although other VOCs found in the groundwater were present on the Bermite site, SCVWA's own expert acknowledged that some of these VOCs came from a "source other than the Bermite site." 6-ER-1206.

For example, SCVWA's director of operations admitted that some VOCs came from the "Flamingo Dry Cleaners" only a mile or so to the north. 6-ER-1273, 6-ER-1275; 2-ER-155. Even more important, significant levels of VOCs were found at the Saugus Industrial Center ("SIC"), only about 700 feet away from the S-1 well. 6-ER-1177; 7-ER-1438; 8-ER-1697–98. A manufacturing facility operated at the SIC from 1958 to 2003, 7-ER-1440, which reportedly used over 50 million pounds of VOCs each year, including over 300,000 pounds of TCE in one year alone, 6-ER-1316–17, and spills were reported there as late as 2002. 7-ER-1440. Indeed, recognizing that Saugus was responsible for a substantial portion of the contamination, the jury assigned to Saugus 30% of fault for the contamination of the wells. 1-ER-33–34; 3-ER-601–10.

Thus, even absent any contamination from the Bermite site, a significant amount of the VOC contamination in the groundwater under SCVWA's wells would remain, and there is no evidence that the treatment facilities that SCVWA seeks to construct would remove only the portion of the contamination from the Bermite Site.

### C. Because There is No Evidence the Proposed Treatment Facilities Would Restore Conditions Prior to Injury, the Cost of the Facilities Are Not Genuine Restoration Costs

Because SCVWA did not show that the groundwater treatment facilities it proposed would return the groundwater in its wells to their condition absent the contamination from the Bermite site, the costs of constructing and operating those facilities do not measure the damages suffered by SCVWA and thus are not genuine restoration costs.

This conclusion is supported by a remarkably similar California case involving proposed treatment of groundwater contamination. In *Starrh I*, a landowner claimed that the groundwater under its property, which was "naturally high in salts and other minerals," had been degraded even further by wastewater from oil production activities on adjacent land. *Starrh I*, 153 Cal. App. 4th at 167-68. Rejecting a multi-billion-dollar project proposed by the landowner to restore the groundwater to its native condition, *id*. at 591, the jury awarded $3.8 million in restoration costs. *Id*. at 589. Agreeing that there was "no evidence to support a finding this amount would restore [the landowner's] property to its original condition," the California Court

of Appeal vacated the award and remanded for a new trial on damages. *Id*. at 600.

On remand, the plaintiff sought to recover restoration costs based on expert testimony concerning a more limited treatment plan costing only hundreds of millions of dollars. *Starrh and Starrh Cotton Growers v. Aera Energy LLC*, 2012 WL 210452 (Cal. Ct. App. 2012) (unpublished) ("*Starrh II*").[10] The defendant argued that these were not genuine restoration costs because the plan "would not restore the water to its original condition, but would instead result in water of better quality than the original." *Id*. at *20. The trial court agreed. The defendant, the court observed, was "only responsible for a restoration project that would return the native water under [plaintiff's] property to its original state or condition," not "for cleaning the native water to a better quality." *Id*. at *21 (quotation omitted). Finding no evidence that the proposed project would return the groundwater to that state

---

[10] This Court may consider unpublished California decisions, even though it is not bound by them. *See Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 870 n.7 (9th Cir. 2022); *Haskell v. Harris*, 669 F.3d 1049, 1055 (9th Cir. 2012).

(and thus measure damages), the trial court held the expert's testimony irrelevant and excluded it. *Id*.

The testimony concerning SCVWA's proposed water treatment facilities suffers from the same deficiency. SCVWA proposed a restoration project to clean contaminated groundwater, but failed to present evidence that the project will return the groundwater to its condition absent injury. As a consequence, SCVWA has not shown that the costs of the proposed project are genuine restoration costs that measure its damages rather than putting it in a better position than it would have been and providing an unwarranted windfall. Thus, under California law, the costs of the groundwater treatment facilities are not genuine restoration costs.

This conclusion is supported by decisions from outside of California recognizing that the costs of repairs and restoration projects constitute genuine restoration costs only if "'the repairs do not enhance the value of the property over what it was before it was damaged.'" *Falco v. James Peter Assoc., Inc.,* 365 A.2d 301, (Conn. 1973) 445-46 (1973) (quoting *Whitman Hotel Corp. v. Elliott & Watrous Engineering Co*., 79 A.3d 591, 596 (Conn. 1951)); *see also State v. Urbanek*, 177 N.W.2d 14, 16, 18 (Iowa 1970) (absent

evidence of the property's value, plaintiff seeking restoration costs "was required to show at least the repairs did not restore the property to a better condition than before it was before the accident"); *Robson v. Zumstein Taxicab Co*., 248 S.W.2d. 872, 872 (Ky. Ct. App. 1923) (vacating restoration costs award because "the repairs may render the article more valuable than it was before the injury"); *Massachusetts Port Auth. v. Sciaba Constr. Co*., 766 N.E.2d 118, 126 (Mass Ct. App. 2002) ("The plaintiff should not be awarded an amount that would put the property into a condition substantially better than it was at the time of the injury"); *Bluemlein v. Szepanski*, 300 N.W.2d 493, 497 (Mich. Ct. App. 1980) (vacating restoration costs award because jury instruction allowed recovery of "an amount equal to what [plaintiff] would have received if the pole barn had been new when it was destroyed"); *Higgins v. Standard Lloyds*, 149 S.W.2d 143, 147 (Tex. Ct. App. 1941) (where damaged automobile is repaired, the defendant is "only liable for so much for the expenditures made therefor as are necessary to put the injured property in its former condition immediately prior to its injury"); *Union City Transfer Co v. Texas & N.O. Ry. Co*., 55 S.W.2d 637, 638 (Tex. Ct. App. 1932) (plaintiffs seeking restoration costs are "required to show, at least, that the

repairs did not restore the property to a better condition than it was before the accident"); *see also In re Malden Mills Indus., Inc.*, 303 B.R. 688, 698 (1st Cir. Bankr. 2004) ("Nor can recovery of repair costs put a structure in a better condition than it was before the injury."); *Town of Superior, Montana v. Asarco*, 874 F. Supp. 2d 937 (D. Mont. 2004) (Plaintiff may not seek restoration costs "for restoration to a condition that far exceeds that [the plaintiff] purchased four years ago.").

For example, in *Falco v. James Peter Associates*, 335 A.2d 301 (Conn. 1973), the Connecticut Supreme Court vacated an award of restoration costs because the plaintiffs failed to show that the proposed restoration project would restore their property to its former condition. The plaintiffs in *Falco* were homeowners who claimed that a development on an adjoining property had altered the natural flow of water and raised the water table on their property, causing seepage in their cellar and workshop. *Id*. at 444. Much like SCVWA, the referee appointed to resolve the case deemed a construction project correcting the problem, the construction of a concrete retaining wall and a drain, as restoration costs. However, the referee made no finding "whether the repairs contemplated would enhance the value of the

property over what it was before the injury." *Id.* at 446. The Connecticut Supreme Court vacated the award, ruling that the referee had "applied an incorrect measure of damages." *Id.* at 447. Repair costs, the Court ruled, are recoverable as restoration costs only if "the repairs do not enhance the value of the property over what it was before it was damaged." *Id.* at 446 (quotation omitted).

Thus, a long line of cases recognizes that expenses for repairs and remediation projects are recoverable as restoration costs only if there is evidence that they restore the damaged property to its condition before injury, not some different, potentially better condition.

The governing principles are well-established under California law. As shown above, *see supra* pp. 47-50, California courts have long recognized that compensatory damages, including restoration costs, should provide just compensation "and no more," *Estate of de Laveaga*, 50 Cal. 2d at 488; *Starrh I*, 153 Cal. App. 4th at 599; *Mozzetti*, 67 Cal. App. 3d at 576 (emphasis omitted), and restoration costs are a measure of compensatory damages focused on the cost of restoring damaged property to its former condition "prior to the injury" at issue. *Salazar*, 245 Cal. App. 4th at 644; *see also Geddes &*

*Smith, Inc.*, 63 Cal. 2d at 605; *Green*, 205 Cal. at 336; *Linforth*, 156 Cal. at 62. SCVWA should not be allowed to recover the costs of a project that it has not shown measure damage to the property by returning to its condition prior to injury.

### D. The District Court's Rulings Upholding the Jury's Restoration Costs Award Are Contrary to California Law, the Record, and the Nature of Restorations Costs

In upholding the jury's restoration costs, the District Court ruled that California law does not require repair costs to restore property to its original condition, 1-ER-12, and that, in any event, SCVWA had presented evidence that the proposed treatment facilities would restore that condition, 1-ER-13. Both rulings are demonstrably wrong.

*First*, California law *does* require restoration costs to restore damaged property to its condition to prior injury. As shown above, restoration must do so in order to measures damages rather than provide unwarranted windfalls. *See supra* pp. 57-60. California courts have consistently required restoration costs to restore damaged property to its "original condition," *Green*, 205 Cal. at 336, *Starrh I*, 153 Cal. App. 4th at 599; *Mozzetti*, 67 Cal. App. 3d at 576, "former

61

condition," *Geddes & Smith*, 63 Cal. 2d at 605; *Linforth*, 156 Cal. at 62, "or condition prior to the injury," *Salazar*, 245 Cal. App. 4th at 644; *Heninger*, 110 Cal. App. 3d at 862; *see also Kelly*, 179 Cal. App. 4th at defining restoration costs as the cost of restoring property "to its pretrespass condition").[11]

*Heninger v. Dunn*, 101 Cal. App. 3d 858 (1980), does not suggest otherwise. The District Court cited *Heninger* in asserting assertion that "California law does not rigidly define repair costs to be limited to restoring the real property to its original condition." 1-ER-12. But *Heninger* defined restoration costs in essentially the same way as other California courts: "the cost of restoring property to its *condition prior to the injury*." *Heninger*, 101 Cal. App. 3d at 862 (emphasis added).

In suggesting that *Heninger* departed from the established definition, the District Court quoted two passages from the decision.

---

[11] As noted above, there is some flexibility where property "could not be completely repaired and restored to its previous condition." *Merchant Shippers Ass'n*, 28 Cal. 2d at 926. In that situation, a plaintiff may recover the cost of the repairs and "the difference between its value before the injury and its value after the repairs have been made." *Id*. (quotation omitted). However, there is no situation in which restoration costs may be awarded without regard to the condition of the property before injury.

1-ER-12. The first passage states that there is "no fixed, inflexible rule for determining the *measure* of damages for injury to, or destruction of, property" and that courts should use "whatever formula is most appropriate … in the particular case." *Heninger*, 101 Cal. App. 3d at 862 (emphasis added; quotation omitted). That statement, however, merely recognizes that there are multiple measures of property damages (such as diminution in value, restoration costs, loss of use, or lost profits) and that courts may use the measure most appropriate to the case. *See Mozzetti*, 67 Cal. App. 3d at 576. There is no suggestion that repairs or construction projects may constitute restoration costs without regard to whether they measure the damages suffered.

The second passage quoted by the District Court is equally inapposite. In that passage, *Heninger* observed that the "[t]he rule precluding recovery of restoration costs in excess of diminution is, however, not of invariable application." *Heninger*, 101 Cal. App. 3d at 863. Here again, *Heninger* was discussing when it is appropriate to use the restoration costs to measure damages, not how restoration costs are defined and applied. Indeed, in the very next sentence *Heninger* observes that restoration costs may exceed diminution in value where the property owners has personal reason for "restoring

*the original condition*" of the property. *Id*. (emphasis added; quotation omitted).

*Second*, the District Court had no basis for asserting that SCVWA "produced evidence that treatment of the water would restore it to its pre-harm condition (i.e., the position it would have occupied had Defendant not contaminated the groundwater)." 1-ER-13. In opposing the JMOL motion, SCVWA cited no such evidence. To the contrary, it noted Dr. Najm's testimony that "the proposed treatment system would remove [toxic and carcinogenic] chemicals," 2-ER-62 (citing 6-ER-1225–27, 6-ER-1230, 6-ER-1255–56)—not that the proposed treatment system would reduce the levels of those chemicals to the levels where they would have been had they been contaminated only by the SIC, the Flamingo Dry Cleaners, and other sources besides the Bermite site.

Nor does the District Court cite any such evidence. It merely notes that SCVWA "presented evidence that the treatment system would remove from its supply wells the contamination caused by plaintiff" (1-ER-13) without any consideration whether it would remove other contamination as well and thus give SCVWA an impermissible windfall.

Thus, there is no evidence that the costs of the project proposed by the plaintiff would restore the property in question to its condition prior to injury and thereby measure the damages from that injury. Consequently, SCVWA failed to show that the costs of the project constitute genuine restoration costs, and therefore the award based on those costs should be vacated.

## III. EVEN IF NOT VACATED, THE RESTORATION COSTS AWARD SHOULD BE REDUCED BECAUSE IT IS UNREASONABLE IN RELATION TO ANY ACTUAL DAMAGE

Even if the more than $60 million awarded for groundwater treatment facilities constituted genuine restoration costs, the award would have to be reduced because this amount is unreasonable and excessive in relation to the minimal harm to the groundwater in question.[12]

Even where restoration costs are appropriate and genuine, they must be reasonable in size. California courts have long recognized that "restoration costs 'are allowed only if they are reasonable in light of … the actual damage sustained.'" *Salazar*, 245 Cal. App. 4th at 644 (quoting *Orndorff v. Christiana Community Builders*, 217 Cal. App.

---

[12] Whittaker raised the argument that the restoration costs award is unreasonable in its Rule 50(a) motion. 2-ER-194–95, 199.

3d 683, 690 (1990)). Accordingly, "[p]roposed replacement costs may be unreasonable or excessive in relation to the damage inflicted on the land or its value prior to the trespass." *Heninger*, 101 Cal. App. 3d at 865; *see also Kelly*, 179 Cal. App. 4th at 451 ("[A]n award of [restoration] costs may be unreasonable as a matter of law if it is grossly disproportionate to the value of the property or the harm caused by the defendant.").

The more than $60 million in restoration costs awarded here is unreasonable and excessive in relation to the limited harm to the groundwater used by SCVWA. While the jury found that the groundwater was contaminated by both perchlorate and VOCs from the Bermite Site, Whittaker already has installed perchlorate treatment systems for three of the four wells (S-1, S-2 and V-201) at issue in this case. 2-ER-129; 6-ER-1319. As a consequence, only small portion of the construction costs sought by SCVWA are for perchlorate treatment. According to SCVWA's initial disclosures, only about 20% of the costs ($3.1 million out of $16 million) were for perchlorate treatment. 4-ER-656. While Dr. Najm did not separate out the costs of perchlorate treatment, it nonetheless appears that only about $19 million in the restoration costs were for perchlorate

treatment.[13] Thus, the jury's $64 million restoration costs award contained over $40 million in restoration costs for VOC treatment facilities. This amount is unreasonable given the little to no harm to SCVWA caused by VOCs.

There is no evidence that VOC levels at any of the four wells at issue have ever exceeded EPA's MCL—the highest level of a contaminant allowed in drinking water. 6-ER-1174, 6-ER-1246; 2-ER-129, 131–32. And, undisputed evidence showed only limited harm from VOC contamination below the MCLs. SCVWA's Chief Operating Officer Keith Abercrombie admitted at trial that VOC contamination caused little harm to SCVWA's groundwater. 6-ER-

---

[13] SCVWA calculated that the costs of constructing VOC treatment facilities for the S-1 and S-2 wells to be $7.6 million. 9-ER-1991. The V-205 well, where perchlorate treatment would be added, has 18% larger volume than the combined S-1 and S-2 wells (2,700 rather than 2,200 gallons per minute). *Id*. Even if it is assumed that there would be no economies of scale and the construction costs would increase proportionally, the costs of constructing a VOC-only treatment facility for V-205 would be approximately $8.6 million, which is half of the $17.3 million in projected construction costs for a facility treating both perchlorate and VOCs. *Id*. Likewise, only about $10.5 million of $21 million in projected operation and maintenance costs for V-205 can be attributed to VOCs as opposed to perchlorate.

Thus, only about $19 million out of the more than $60 million in restoration costs asserted by SCVWA relate to perchlorate treatment.

1172–81. Indeed, Abercrombie could not remember the last time that VOCs in the groundwater were above the relevant public health goal—which is below the actionable MCL—for any of the SCVWA wells at issue, 6-ER-1172, and he did not know whether those levels had ever been exceeded at the S-1 and S-2 wells. 6-ER-1173.

In addition, SCVWA represented in public reports and communications with state agencies that only "'trace amounts'" of VOCs (below the MCLs) have been found in the groundwater at issue and that the water SCVWA currently provides to customers from the wells at issue is "safe to drink." 8-ER-1910; 9-ER-2012–13 (reporting that groundwater from well V-201 with detectable concentrations of VOCs "could be served to homes for drinking"). Based on this evidence, the District Court found no "substantial endangerment to health and the environment" under RCRA. 2-ER-159–161.

The lack of harm is particularly clear with respect to S-1 and S-2, the two wells that SCVWA is currently using for drinking water. SCVWA has repeatedly represented to regulators and to the public that it is able to provide safe drinking water now—without any VOC treatment facilities—at those wells. For example, in December 2016, SCVWA's senior engineer James Leserman sent a letter to DDW

stating that some TCE and other organic compounds had been found, but that "no discernible trends can be observed at this time that would suggest a water quality change or any new imminent threat to Saugus 1 and 2 wells." 9-ER-1999; *see* 6-ER-1287–89. In its 2018 water report, SCVWA similarly represented that, while trace amounts of VOCs had been detected, "the Valley's water supply complies with state and federal drinking water standards." 7-ER-1565; 6-ER-1169–70. Leserman also testified at trial that he was unaware of a current threat or, indeed, any increase in VOCs at the wells since those representations were made, 6-ER-1289–90, and this Court found that they had not been disputed by DDW or DTSC. 2-ER-132.

Any harm *caused by Whittaker* is even more minimal. Whittaker presented evidence at trial establishing a likelihood that sources other than the Bermite site are primarily responsible for the contamination found at S-1 and S-2. *See* 6-ER-1309–10 (Bermite site not the source of DCE found at S-1 and S-2); 6-ER-1304–05 (no consistent presence of TCE in wells on western border of property, which would be expected if VOCs were migrating from the Bermite site toward S-1 and S-2); 6-ER-1307 (Bermite site not source of

VOCs at the wells at issue). And, the jury found SIC 30% at fault for the contamination. *See* 2-ER-175.

More than $40 million in restoration costs for such limited harm is excessive and unreasonable. In *Heninger v. Dunn*, 101 Cal. App. 3d 85, the California Court of Appeal held that $241,257 to restore a grove of trees was "manifestly unreasonable expense" in relation to the value of the land prior to the destruction of the trees. *Id.* at 866. The land was initially valued at $179,000, *id.* at 861, about 75% of the award. Here, although Whittaker did not have an opportunity to quantify the harm to the groundwater because of SCVWA's belated assertion of restoration costs, *see supra* pp. 40-45, it is plain that the more than $40 million awarded for VOC treatment is orders of magnitude greater than any damage to the groundwater caused by VOC contamination. If the requirement that restoration costs have a reasonable relation to the damage inflicted means anything, it must preclude the award here.

In ruling that the restoration costs award was not excessive and unreasonable, the District Court made no attempt to explain how the restoration costs awarded by the jury were reasonable in relation to the limited harm caused by VOC contamination. The District Court

merely disputed the relevance of its ruling on substantial endangerment, pointing out that this ruling was made "for purpose of Plaintiff's RCRA claim seeking injunctive relief" and that the jury's award was "based on different legal theories with different legal requirements." 1-ER-14 (emphasis omitted). The District Court's substantial endangerment ruling, however, was only a small aspect of Whittaker's challenge to the excessiveness of the restoration costs award. While Whittaker noted the ruling at the beginning of its argument, 2-ER-99, the bulk of its argument was devoted to the evidence recounted above regarding SCVWA's admissions that there were only trace amounts of VOC contamination in its groundwater, that the water was safe to drink, and that it continued serving water with detectable concentrations of VOCs from S-1 and S-2 with approval from DDW. 2-ER-99–101. The District Court did not even attempt to explain how this evidence can be reconciled with the restoration costs exceeding $40 million.

Citing this Court's decision in *Brady v. Gebbie*, 859 F.2d 1543 (9th Cir. 1988), the District Court also ruled that the restoration costs award was "not manifestly excessive." 1-ER-15. *Brady*, however, did not apply California law's requirement that restoration costs have a

reasonable relationship to the damage inflicted. Indeed, *Brady* did not involve either California law or restoration costs. Instead, *Brady* considered a Section 1983 claim in which the plaintiff sought damages for emotional distress, which the defendant claimed were excessive. *See Brady*, 859 F.2d at 1545-47, 1557-58. In doing so, *Brady* applied the general—and extremely forgiving—standard for an "otherwise supportable verdict": whether the damages were "grossly excessive, monstrous, or shocking to the conscience." *Id*. at 1557 (cleaned up). That standard has no bearing on the claim here that undisputed evidence shows that the restoration costs award violates the reasonable relation requirement imposed by California law.[14]

Thus, even if the restoration costs award as a whole is not vacated, the more than $64 million awarded for such costs should be reduced by $44.2 million—the portion of the award attributable to treating VOC contamination that the evidence showed need not be removed to protect the public.

---

[14] The District Court also noted that a reasonable fact finder might have found that the VOC treatment facilities "would facilitate DDW's issuance of a permit." 1-ER-14. It failed to explain how that fact has any bearing on the reasonableness of the restoration costs award. The District Court's observation that two of SCVWA's wells "rely on an 'extremely impaired' water source" (1-ER-14–15) is similarly inexplicable.

| Wells | Treatment | Capital Costs | O&M Costs | Total |
|-------|-----------|---------------|-----------|-------|
| S-1 and S-1 | VOCs | $7.6 million | $6 million | $13.6 million |
| V-201 | VOCs | $5.5 million | $6 million | $11.5 million |
| V-205 | VOCs | $8.6 million | $10.5 million | $19.1 million |
| | Perchlorate | $8.6 million | $10.5 million | $19.1 million |

In the alternative, the Court should order a new trial on the limited issue of determining an appropriate award for the cost of installing perchlorate treatment at V-205.

## CONCLUSION

The judgment below should be vacated with respect to damages, and the case remanded to the District Court with instructions to deny all restoration costs. Alternatively, the case should be remanded to the District Court with instructions to reduce the restoration costs award by $44.2 million or conduct a new trial on such costs.

Dated: March 8, 2023

Respectfully submitted,

/s/ Mark E. Elliott

Shelby L. Dyl
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
1200 Seventeenth Street,
N.W.
Washington, D.C. 20036

Mark E. Elliott
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
725 South Figueroa St., 36th Fl.
Los Angeles, CA 92037

*Counsel for Defendant-Appellant/Cross-Appellee Whittaker Corporation*

## STATEMENT OF RELATED CASES

There are no other cases pending in this Court that are related to these consolidated cases under Circuit Rule 28-2.6.

Dated: March 8, 2023

PILLSBURY WINTHROP
SHAW PITTMAN, LLP


/s/ Mark E. Elliott
Mark E. Elliott

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1, I certify that the foregoing brief is in 14-point, proportionally spaced Times New Roman type and contains 13,968 words excluding the items exempted by Fed. R. App. P. 32(f).

Dated: March 8, 2023        PILLSBURY WINTHROP
                         SHAW PITTMAN, LLP

                         /s/ Mark E. Elliott
                         Mark E. Elliott

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2023, I caused the foregoing Appellants' Opening Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in this appeal are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 8, 2023        PILLSBURY WINTHROP
                           SHAW PITTMAN, LLP


                           /s/ Mark E. Elliott
                           Mark E. Elliott